Date signed February 17, 2010



**ROBERT A. GORDON**
**U. S. BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Baltimore**

| | | |
|---|---|---|
| In re: | * | |
| James Paul Quillen, Jr. | * | Case No. 06-15938-RAG |
| Debtor | * | Chapter 7 |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| Baltimore County Savings Bank, FSB | * | |
| Plaintiff | * | |
| v. | * | Adversary No. 07-00839 |
| James Paul Quillen, Jr. | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

**I.    Introduction**

On September 26, 2006, James Paul Quillen, Jr., the Debtor in the main case and

Defendant in this Adversary Proceeding, filed a petition for relief under Chapter 11 of Title 11 of

the United States Code.  The case was thereafter consensually converted to one under Chapter 7 by Order entered on July 26, 2007.[1]

On October 26, 2007, Plaintiff Baltimore County Savings Bank, FSB (BCSB), filed a two-count Complaint for Determination of Dischargeability of Debt (Complaint) (Dkt. No. 1) seeking to have the debt owed by the Defendant byway of his personal guarantee of a loan declared non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B).[2]  The Defendant filed his *pro se* answer (Dkt. No. 6) on December 3, 2007 along with a Motion to Dismiss the Complaint as Untimely (Motion to Dismiss) (Dkt. No. 7).  On January 15, 2008, a hearing was held on the Motion to Dismiss and BCSB's opposition thereto. The Court orally denied the Motion to Dismiss, directed the Plaintiff to file an amended complaint for reasons unrelated to the Motion to Dismiss and set a pre-trial schedule.[3]  A Scheduling Order was entered on January 24, 2008 (Dkt. No. 12).

The Amended Complaint to Determine Dischargeability of Debt (Amended Complaint) (Dkt. No. 14) was filed on January 30, 2008;[4] however, the Defendant did not file an answer until August 4, 2008 (Dkt. No. 33).[5]  Save for Mr. Quillen's failure to file a pre-trial memorandum, the

---

[1] The history of the main case is set forth in some detail in *In re Quillen*, 408 B.R. 601 (Bankr. D. Md. 2009).

[2] Hereafter, unless otherwise noted, all statutory citations are to the Bankruptcy Code (Code), found at Title 11 of the United States Code.  All references to Rules are to the Federal Rules of Bankruptcy Procedure. Fed. R. Bankr. P. 1001 *et seq.*

[3] A Memorandum  of Decision in Support of Order Denying Motion to Dismiss  and separate Order denying the Defendant's Motion to Dismiss were entered on July 14, 2008 (Dkt. Nos. 23 and 24, respectively). *Baltimore County Savings Bank, FSB v. James Paul Quillen, Jr. (In re Quillen)*, 2008 WL 2778881 (Bankr. D. Md.).

[4] At trial, counsel for BCSB requested that the Amended Complaint be amended again to include the substance of Plaintiff's Exhibit 12, a Statement of Debt. The amendment was allowed without objection.

[5] As a further reflection of the Defendant's tardiness, on April 25, 2008 the Plaintiff filed a Motion for Sanctions or, in the Alternative, to Compel Discovery (Motion for Sanctions) (Dkt. No. 17) due to Mr. Quillen's failure to respond to discovery.  Mr. Quillen did not respond to the Motion for Sanctions either.   Nevertheless, a hearing was held on July 17, 2008. The Motion for Sanctions was granted in part and the Defendant was given until July 25, 2008 to file an answer to the Amended Complaint, until August 4, 2008 to fully respond to discovery and was fined $150 plus

parties generally complied with the Scheduling Order and a trial was held on October 6, 2008.  At the conclusion, the parties were given forty-five days to file post-trial memoranda and ten days thereafter to file reply memoranda if warranted.  Plaintiff's post-trial memorandum was timely filed (Dkt. No. 47). The Defendant did not file any additional papers.  Final argument was held and completed on January 13, 2009 and the matter was taken under advisement.

The question presented is whether the debt in question was obtained by the Debtor's intentional use of materially false writings such that it should be excepted from his discharge as a result of his pre-settlement grant of an indemnity deed of trust in favor of certain private investors that was secured by the same real estate as the BCSB debt and which resulted in a loss of the lien priority bargained for by BCSB. That question is now ripe for decision.

## II.   Findings of Fact

### a.  *The Baltimore County Savings Bank Loan*

Three witnesses – Daniel Wernecke, Howard Perlow and Mr. Quillen – testified at trial and the vast majority of the facts they detailed are not in dispute. The parties' general agreement as to what happened to put them at odds effectively narrowed the Debtor's trial presentation to an explanation of why he did not intend to deceive BCSB, notwithstanding the way things appear and the consequences of his actions.

Prior to his Chapter 11 filing, the Defendant was a real estate developer with a significant amount of experience in, and knowledge of, that industry.  He was in control of a plethora of

---

reasonable attorney's fees incurred for the preparation of the Motion for Sanctions.  His fine was reduced by $100 due to BCSB's failure to comply with the discovery guidelines.  An Order memorializing the Court's ruling was entered on July 30, 2008 (Dkt. No. 29).

entities and projects, most apparently related to that business. The entities controlled by him are

listed in his Statement of Financial Affairs (SOFA) and Schedules filed in the main case.[6]

On October 3, 2003 Mr. Quillen signed and submitted a Business Credit Application

(Application) seeking a business loan from BCSB on behalf of QD Tartae, LLC (QD Tartae).[7]

There was no dispute that the purpose of the BCSB Loan was to refinance an existing loan secured

by a first lien on the real property located at 7 West Ridgley Road in Baltimore County, Maryland

(Real Property).[8]  In turn, BCSB was to receive a first lien on the Real Property when the loan

settled.[9]

A Commitment Letter (Letter) dated March 1, 2004 was thereafter sent to the Debtor and QD

Tartae.  The Letter memorialized the proposed loan terms and called for the signatures of the

prospective obligor and each guarantor.  The terms included that BCSB would lend the principal

amount of $2,480,000 and its repayment would be guaranteed by the Debtor, four other entities

controlled by him, and his wife.[10]  The Letter also provided that the BCSB Loan would be secured

by a "First Priority Indemnity Deed of Trust" on the Real Property to be granted by Q-C Ridgley.

---

[6] The SOFA and Schedules (Dkt. No. 40) filed on November 2, 2006 listed seventy-seven (77) entities controlled by the Debtor, eighteen (18) of which were identified as single asset real estate entities.  Mr. Quillen has testified that different entities were created to deal with separate, single-asset projects often with the concurrence, or even insistence, of his lenders.

[7] The resulting indebtedness will hereafter be referred to as the BCSB Loan.

[8] Until a foreclosure sale held on August 27, 2007, the Real Property was owned by another entity controlled by the Debtor, Q-C Ridgley, LLC (Q-C Ridgley). The prior lien secured a debt in the approximate amount of $2.2 million and was held by Mercantile Safe Deposit and Trust Company (Mercantile).  That loan will be referred to as the Mercantile Loan.

[9] Under the "COLLATERAL" section, the Application states "FIRST ON 7 WEST RIDGELY ROAD".

[10] The four entities were Quillen Development, Inc., Q-C Triple Net Properties, LLC, JP Quillen Revocable Living Trust, and Q-C-Ridgley. Simple math shows that Mr. Quillen anticipated a 'cash out' benefit to himself of greater than $200,000 from the arrangement.

The Letter reiterated that the transaction's purpose was to refinance the existing Mercantile Loan. On March 3, 2004, the Letter was executed in full.

Settlement was scheduled for March 30, 2004. It was undisputed that prior to that date, BCSB obtained both an appraisal and a title report of the Real Property. The appraisal's purpose was to confirm there was equity sufficient to support the mandated loan to value ratio while the goal of the title report was to uncover any encumbrances other than the Mercantile Loan. Although neither was offered into evidence, undisputed testimony established that the underlying assumptions – that the level of equity was sound and there were no other lienholders – were confirmed. On March 30th, the Defendant and the other Obligors executed a Commercial Loan Statement & Affidavit (Affidavit) affirming *inter alia* that the Loan would be secured by a first indemnity deed of trust on the Real Property.  An Indemnity Deed of Trust in favor of BCSB (BCSB IDOT) was also signed and dated that day.  It was later recorded on April 13, 2004.

### b. *The Foreman Group Loan and Intervening Indemnity Deed of Trust*

Mr. Quillen was busy around the time he was negotiating the BCSB Loan. In part, this was due to the parallel negotiations he was conducting with William Foreman, Anne-Louise Perlow and Milton Dubrov (Foreman Group) on behalf of Q-C Triple Net.  Those negotiations resulted in three separate loans to Mr. Quillen's benefit with a combined principal balance of $300,000 (Foreman Group Loan).[11] There was no dispute that the Foreman Group understood that its Loan would be secured by a second priority indemnity deed of trust and assignment of leases and rents against the Real Property. The Foreman Group Loan closed on February 13, 2004.  At that time, the Defendant executed an Indemnity Deed of Trust, Security Agreement and Assignment of

---

[11] The resulting promissory notes were executed by the Defendant on behalf of Q-C Triple Net. The $50,000 note in favor of Ms. Perlow was dated February 3, 2004. The notes in favor of Mr. Foreman and Mr. Dubrov were dated February 13, 2004 with principal amounts of $50,000 and $200,000, respectively.

Contracts, Leases and Rents (Intervening IDOT) on behalf of Q-C Ridgley.  The Intervening IDOT was recorded on February 20, 2004.

Although the Foreman Group understood that their lien would be in second position, this understanding was with respect to the existing Mercantile Loan.  This is so because the Foreman Group's spokesperson – Howard Perlow – claimed to be unaware of the Defendant's contemporaneous negotiations with BCSB to the ultimate end of refinancing the Mercantile obligation. And the reason given for this ignorance was that the Defendant did not tell them about those negotiations.

In response, Mr. Quillen did not assert that his dealings with BCSB were revealed in any great detail to the Foreman Group. Yet, he did dispute Mr. Perlow's testimony to a degree by claiming that they had an understanding that the Foreman Group would hold the Intervening IDOT in order to permit the BCSB IDOT to be recorded first.  Mr. Perlow explicitly denied any such arrangement. In fact, he testified that had the Foreman Group been aware of the prospective BCSB IDOT and its anticipated priority, their loan would not have been made due to the effect of the greater principal balance on the Real Property's slim equity.

As for BCSB's prior knowledge of the Foreman Group Loan, there was none. Mr. Quillen did not dispute that BCSB was unaware of his dealings with the Foreman Group before the closing of the BCSB Loan. Likewise, BCSB's representatives were completely unaware of the Intervening IDOT's recordation.  The Intervening IDOT did not appear on BCSB's title reports and the parties seem to agree that this was caused by the two to three month 'gap' period between the Intervening IDOT's filing and its actual indexing in the land records.  In other words, the presence of the Intervening IDOT was hidden by the sloth-like recordation process of the land records prevailing at that time. Whether Mr. Quillen anticipated the 'gap', sought to take advantage of it and intended

6

the natural consequences of those activities – the shady completion of both transactions with a resulting loss of priority to the BCSB IDOT – was therefore the crucial question presented at trial. There was no dispute that, (a) in making the loan BCSB relied upon the Defendant's written representations that they would receive a first priority lien against the subject real estate and (b) that had BCSB known of the Intervening IDOT, the Loan would not have been made.

The existence of the Intervening IDOT was discovered when QD Tartae defaulted and the Plaintiff began to make ready for foreclosure.  At that time, an updated title report was obtained and a reference to the Intervening IDOT was included in it.[12] Eventually, this Adversary Proceeding was commenced. Based upon the theory that the BCSB Loan would not have been made had the Intervening IDOT been revealed, and that Mr. Quillen's failure to reveal it was intentional, BCSB seeks damages in the total amount of its outstanding and unsatisfied deficiency resulting from the foreclosure. Moreover, it seeks to have that sum – $637,333.22 – declared nondischargeable.

III.    **The Witnesses' Testimony and the Documentary Evidence**

Because the question of dischargeability is presented, the witnesses' testimony and the documentary evidence must be given close and careful scrutiny.

### a. *Daniel Wernecke*

Mr. Wernecke testified in his capacity as Executive Vice-President of BCSB. It was he who presented the BCSB Loan to the bank's loan committee for approval. Regarding Exhibit 1, the Application, he testified that, it is "taken with the information that we rely upon to make a decision to grant credit to a customer."  Trial Tr. 26:19-20, Oct. 6, 2008.  When asked to define the phrase, "First on 7 West Ridgley Road" included in the Application he explained, "That means we would be in a first position on the property."  Trial Tr. 27:13.

---

[12] Mr. Perlow testified that the Foreman Group learned of the BCSB IDOT at around the same time.

Next, Mr. Wernecke was shown the Letter and was asked about its terms. Describing the 'security' section he indicated that BCSB's collateral was to include "not only the first priority indemnity deed of trust, but also an assignment of rents and leases…" Trial Tr. 28:14-15.  When asked whether the Bank relied upon the terms of the Letter in making the loan, he replied, "Absolutely."  Trial Tr. 29:6.

With respect to Exhibit 3, the Affidavit, he testified that at the time of settlement the Bank relied upon Mr. Quillen's execution of that document and the truthfulness of the representations therein; i.e., that the Bank would receive a first indemnity deed of trust on the Property.

Regarding the BCSB IDOT itself, the following questions and answers were recorded on direct examination:

> Q.    And what interest was this document supposed to grant the Bank?
>
> A.    The amount of $2,480,000 and the property at 7 West Ridgely Road.
>
> Q.    What was the position supposed to be of that interest?
>
> A.    First position.

Trial Tr. 32:3-8.

*       *       *

> Q.    Okay. So was there a relationship between this loan and the Mercantile Loan?
>
> A.    Our, our responsibility of our title company at the time was to make sure that we paid off the Mercantile loan so that we would be a first position.

Trial Tr. 32:12-16.

Mr. Wernecke was also asked about title reports obtained in advance of settlement.

> Q.    In connection with closing on this loan, did the Bank ever obtain any title work on the property?

8

> A        Absolutely. We obtained title work and we wanted to make sure
> we were in a first position before we settled…So there was up-to-
> date title prior to settlement.

Trial Tr. 34:10-25.

*       *       *

Mr. Wernecke was then asked about the importance of the appraisal.

> Q.       Did you rely on the value of the property in making the loan?

> A.       Yes.

> Q.       Okay. Was that the main factor that you relied, the Bank relied
> upon in making the loan?

> A.       That's one of the factors. You know, there's also the – the – the
> primary factor, first, is the cash flow and the secondary factor is
> the collateral, along with the guarantors.

Trial Tr. 35:22 - 36:4.

Mr. Wernecke also confirmed that the Bank would not have made the loan had it

known of the Intervening IDOT securing the Foreman Group Loan. When asked 'why', he

testified:

> A.       Because our loan-to-value position would have been compromised.
> We would also rely on this loan to be a first position and be in the
> control of the property, not as a subordinate lien to someone else
> who was already on there.

Trial Tr. 38:8-11.

Mr. Wernecke's testimony came to an end with a confirmation of the Bank's

elements of damages and the affirmation of Mr. Quillen's fundamental legal liability for

the debt as a result of his guaranty.

Cross-examination was used by Mr. Quillen to make the following points:

1.     That Mr. Quillen had an ongoing business relationship with the Bank at the time this debt was incurred;

2.     That several time-consuming steps were taken before settlement;

3.     That probably no 'bring-to-date' title report was obtained immediately before settlement; and

4.     A handful of the Bank's exhibits did not make literal reference to a 'first lien' position.

### a. Howard Perlow

Mr. Perlow testified with respect to the circumstances surrounding the creation of the Foreman Group Loan.  At the time of the trial, he was employed by Residential Title and Escrow as a Vice-President. His wife was one of the lenders that comprised the Foreman Group. According to Mr. Perlow, Mr. Quillen came to him to solicit his aid in procuring private investors willing to make a loan. He did so and the three individuals solicited became the Foreman Group. Mr. Perlow negotiated the loans and understood that all three were to be secured by a second deed of trust on "7 West Ridgely Road".   Trial Tr. 68:20.

With respect to the senior liens, Mr. Perlow testified as follows on direct examination by BCSB's counsel:

Q.     And what was supposed to be the first lien on that property?

A.     A Mercantile Safe Deposit and Trust lien.

Q.     Okay. When this document was negotiated and executed, was there any understanding that there would be any other liens ahead of it?

A.     None that I was aware of, no.

Trial Tr. 69:24 - 70:5.

*      *      *

10

Q.    Did you have any reason to believe that this indemnity deed of trust [the Intervening IDOT] would be behind any amount greater than that secured by the Mercantile lien?

A.    No.

Q.    …were you aware of any other loans in process by Mr. Quillen that would be secured by a lien on that same property?

A.    No.

Trial Tr. 70:23 - 71:7.

Mr. Perlow was then asked a series of questions regarding the recordation of the Intervening IDOT and Mr. Quillen's disclosure of the BCSB Loan.

Q.    Okay. At the time that you were negotiating these loan documents for the Foreman Group did you have any understanding with Mr. Quillen about the timing for recording the indemnity deed of trust?

A.    We recorded it pretty timely after the settlement date of February 13th.

Q.    Okay. So did you ever have a conversation with him about holding on to it?

A.    No.

Q.    At the time that you were negotiating and around the closing of the Foreman Group loan did Mr. Dubrov, Mrs. Perlow, or Mr. Foreman, to your knowledge, have any conversation or understanding with Mr. Quillen about the timing for recording the indemnity deed of trust?

A.    Not to my knowledge.

Q.    So Mr. Quillen never asked you to hold the indemnity deed of trust until the Bank, until the Baltimore County Savings Bank deed of trust was recorded?

A.    No.

Q.    Did he ever tell you about the Baltimore County Savings Bank loan?

11

A.    No.

Trial Tr. 73:15 - 74:11.

When Mr. Perlow was asked whether the Foreman Group Loan would have been made behind the BCSB Loan had he known about it he answered:

A.    Well, you're asking me to hypothesize, I guess, but the intent -- I don't think we would have made the loan, that it would have been a two and a half million dollar first mortgage versus a $2.2 million first mortgage.

Trial Tr. 74:16-19.

Mr. Perlow's direct testimony concluded Plaintiff's case.  Mr. Quillen reserved his questions for his defense and Mr. Perlow was re-called as his first witness.  Questioned by Mr. Quillen, Mr. Perlow testified that the 'gap' period – the period of delay between presentation and recordation of loan documents at the land records office – was approximately two to three months at the time of the events in question. Beyond that, Mr. Quillen attempted to establish (as he tried with Mr. Wernecke) that if Mr. Perlow's title company had been used by BCSB with respect to the BCSB Loan, the litigation would not have arisen. However, Mr. Quillen was unable to articulate an intelligible reason as to why this line of questioning was material and BCSB's objections were therefore sustained.

### b.  *James P. Quillen*

Mr. Quillen, the last witness, called himself to the stand.  Allowed to testify in narrative form, he immediately sought to rebut what he understood to be the crucial point by stating, "First, first and foremost, I - - what is being alleged is that I intended to do something, which is very difficult for me to, to accomplish, and that is exploit the gap."  Trial Tr. 86:20-23.  In other words, Mr. Quillen framed the issue as follows:  whether he consciously intended to use the natural delay created by the gap period to cover the existence of the Intervening IDOT and deceive BCSB into

making a loan that would not otherwise have been made.  Mr. Quillen's testimonial explanation
was that he knew that exploiting the gap would not be an "easy" thing to do and that in order to do
so he would have had to insure that all of the BCSB Loan conditions were met in advance of
settlement to guard against delay and the heightened likelihood that the Intervening IDOT might
be discovered.  He added that he was not in serious financial difficulty at that time and that if he
had gotten caught, "it would have had a devastating impact on my business."  Trial Tr. 89:4-5.  In
other words, he offered no compelling insight as to his *intentions* at the time he orchestrated these
events.  Instead, he suggested that (a) the alleged goal would be a hard one to achieve and (b) that
from a business standpoint, the consequences of getting caught would be severe.  He wrapped up
his direct testimony with this comment:

*        *        *

> I certainly did intend as a subordinate loan. I know that's in violation of
> the loan documents, but a subordinate loan that is in violation of the loan
> documents is not nearly as big a deal as trying to put a loan, a lien in front
> of somebody who's getting a first lien.

*        *        *

Trial Tr. 90:1-5.


During a very brief cross-examination these salient points were made:

1.    That Mr. Quillen previously consented to the entry of a judgment in the U.S.
      District Court for the District of Maryland which included an admission by him of
      having committed fraud in a fiduciary capacity; and[13]

2.    That Mr. Quillen did not have any documentation to support his assertion that he
      asked Mr. Perlow to refrain from immediately recording the Intervening IDOT.

---

[13] The details of the underlying case were not delved into in this trial.  The Court had previously been made aware of
this unfortunate blot as a result of other, prior disputes regarding Mr. Quillen.  Nevertheless, it seems from his
testimony in this adversary proceeding that at least a part of the circumstance underlying the judgment was Mr.
Quillen's misrepresentation as to whether contractual escrow deposits were actually made.  After the entry of
judgment, Mr. Quillen was consensually disbarred by the Maryland Court of Appeals.

On re-direct, Mr. Quillen took the position that "lying about deposits and real estate contracts", Trial Tr. 93:12, presumably what he admitted he did in the District Court case, is something accepted as standard practice in the real estate industry but is a very different animal from dishonesty as to the priority of lien positions. The Court concludes that he made this observation to underline his perception of the greater level of risk involved with respect to the conduct he was accused of in this case, thus making his commission of it less likely.  The following exchange between the Court and Mr. Quillen then took place:

Q. So not being honest about lien positions is worse?

A. Oh, absolutely. Yeah.

Q. To what level of "worse"?

A. Well, very significantly worse.

Q. So why didn't you tell them [BCSB] at settlement?

A. Because I firmly believed that Mr. Perlow was going to hold the lien.

Q. Why? Why did you believe that?

A. I believe I had an agreement, a verbal agreement with him. Apparently, he has a different recollection.

Trial Tr. 95:9-18.

## IV.    **Jurisdiction and Venue**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157 and Local Rule 402 of the United States District Court for the District of Maryland.  Venue is likewise proper under 28 U.S.C. §1409(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

## V.     Legal Standards

### a.     Section 523(a)(2)

BCSB's two-count Amended Complaint seeks to have the debt arising from the BCSB

Loan declared nondischargeable under subsections (A) and (B) of Section 523(a)(2).  Section

523(a)(2) excepts from an individual debtor's discharge debts,

> for money, property, services, or an extension, renewal, or refinancing of
> credit, to the extent obtained, by -
>
> (A)    false pretenses, a false representation, or actual fraud, other than a
>        statement respecting the debtor's or an insider's financial
>        condition;
>
> (B)    use of a statement in writing-
>
>        (i)     that is materially false;
>        (ii)    respecting the debtor's or an insider's financial condition;
>        (iii)   on which the creditor to whom the debtor is liable for such
>                money, property, services, or credit reasonably relied; and
>        (iv)    that the debtor caused to be made or published with the
>                intent to deceive.

11 U.S.C. §§ 523(a)(2)(A) and (B).  Subsections (A) and (B) are similar in that a plaintiff seeking

to except a debt from the debtor's discharge under either must prove their case by a preponderance

of the evidence.  *First Nat'l. Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 667 (4th Cir.

1995) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).  However, while the burden of proof

is the same, there are other important differences between how each should be applied.

### b.     Exception from Discharge Under Section 523(a)(2)(A)

It is well established that to prevail in a nondischargeability action under Section

523(a)(2)(A) five elements must be satisfied by the plaintiff.  *Grogan,* 498 U.S. at 288; *In re*

*Rountree,* 478 F.3d 215, 218 (4th Cir. 2007); *Dubois v. Lindsley (In re Lindsley)*, 388 B.R. 661,

668 (Bankr. D. Md. 2008); *Guaranty Residential Lending, Inc. v. Koep (In re Koep),* 334 B.R.

364, 371-72 (Bankr. D. Md. 2005).  Those elements are: (1) that the defendant made a representation, (2) that the defendant knew at the time the representation was made that it was false, (3) that the defendant made the representation with the intent and purpose of deceiving the plaintiff, (4) that the plaintiff justifiably relied upon the false representation, and (5) that the plaintiff suffered damages as a proximate result of the representation. *Lindsley*, 388 B.R. at 668; *Koep,* 334 B.R. at 371-72.

Plaintiff avers that in executing the Application, the Letter, the Affidavit, and the BCSB IDOT, the Defendant made the representation that BCSB would be in a first lien position. Plaintiff further avers that the Defendant knew the representation was false when made, that the representation was made with the intent and purpose of deceiving the Plaintiff, that Plaintiff justifiably relied upon the statement, and that Plaintiff was damaged as a result. Accordingly, Plaintiff asserts that the resulting indebtedness should be excepted from Mr. Quillen's discharge pursuant to Section 523(a)(2)(A).

However, as a matter of law, there is a fatal flaw in this contention.  The Fourth Circuit has expressly held that statements respecting a debtor's financial condition are excluded from the purview of Section 523(a)(2)(A). *Johnson v. International Harvester Co.,* 702 F.2d 490, 491 (4th Cir. 1983).  It requires no searching inquiry to reach this conclusion. The statutory language could not be any clearer.  Were Mr. Quillen's representations ones concerning his financial condition?

In *Johnson,* the debtor made various oral representations to creditors regarding the financial health of her business. Both the bankruptcy and district courts agreed that the resulting debts should be excepted from the debtor's discharge as having been obtained by false representations pursuant to Section 523(a)(2)(A). The Fourth Circuit reversed holding that:

> All of the statements made by Blackwell to the plaintiffs were essentially statements concerning the financial condition of Studio-1. Further, all of

> Blackwell's statements were oral. The representations are therefore outside the scope of [Section 523(a)(2)] and can not be the basis for preventing discharge of the bankrupt.

> *Johnson*, 702 F.2d at 492.

The next year, in *Engler v. Van Steinburg, (In re Van Steinburg)* 744 F.2d 1060, 1061 (4th Cir. 1984), the Court dealt with facts superficially similar to those at bar. In that case, plaintiff was orally assured by the debtor that he would have a first lien on certain property notwithstanding the debtor's knowledge of existing superior liens.  In the bankruptcy court, Judge Mannes refused to except the debt from the debtor's discharge ruling that the representations related to debtor's financial condition and therefore had to be in writing to be actionable.

The appellant argued that Section 523(a)(2)(A)'s caveat only applied to formal financial statements relying upon *In re Pollina*, 31 B.R. 975 (D.C.D.N.J. 1983).  The Fourth Circuit disagreed and held as follows:

> Concededly, a statement that one's assets are not encumbered is not a formal financial statement in the ordinary usage of that phrase. But Congress did not speak in terms of financial statements. Instead it referred to a much broader class of statements – those "respecting the debtor's… financial condition."  *A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition.* Indeed, whether his assets are encumbered may be the most significant information about his financial condition.

*Engler*, 744 F.2d at 1060-61 (emphasis added).  This Court gleans three simple lessons relevant to this case from those two decisions:

1. Statements respecting a debtor's financial condition are not actionable under Section 523(a)(2)(A);

2. In order to be actionable, under Section 523(a)(2)(B), such statements must be in writing; and

3. Statements concerning the presence, or lack, of encumbrances against assets are statements concerning a debtor's financial condition.

It would therefore seem inevitable that Plaintiff's claim under Section 523(a)(2)(A) must fail as it is undisputed that Mr. Quillen's representations concerned BCSB's anticipated lien status against the Real Property.  However, Plaintiff suggests that Mr. Quillen is equally guilty of the crime of omission – that he failed to disclose the grant of the Intervening IDOT when he had a duty to do so – and that 'separate' failure is actionable under Section 523(a)(2)(A). Specifically, Plaintiff contends, "[i]n addition to the Debtor's numerous false statements, his silence on a material element of BCSB's loan decision process amounts to an intentional misrepresentation." (Pl.'s Mem. Dkt. No. 47 ¶ 23).  Cast in those terms, does the claim survive?

Plaintiff relies upon Judge Catliota's opinion in *Ultra Litho, PYT, Ltd. v. Moore (In re Moore)*, 365 B.R. 589 (Bankr. D. Md. 2007) to claim that it should. It is true that Judge Catliota held that a misrepresentation may be implied by silence – where a duty to speak exists but the debtor fails to do so – but the analysis was made under Section 523(a)(2)(A) and, as explained above, that subsection does not apply to this case. Whether the problem is one of omission, or that of an active misrepresentation regarding lien status, a strict interpretation of the statute leads to the conclusion that in either case, the claim arises, if at all, from a failure to honestly represent one's financial condition. Therefore, it falls outside the parameters of Section 523(a)(2)(A).

    *c.      Exception from Discharge Under Section 523(a)(2)(B)*

To sustain an action under Section 523(a)(2)(B) the plaintiff must establish that: (1) the debtor  made a written statement, (2) the written statement was about the debtor's or an insider's financial condition, (3) the statement was materially false, (4) the debtor published the statement with the intent to deceive the plaintiff, and (5) the plaintiff reasonably relied on the false statement to her detriment.  *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1114 (3rd Cir. 1995); *In re Koep*, 334 B.R. at 373; *AVCO Fin. Servs., Inc. v. Abdul'Faruq (In re Abdul'Faruq),* 175 B.R.

618, 622 (Bankr. E.D. Va. 1994); *I.H. Miss. Valley Credit Union v. O'Connor (In re O'Connor)*, 149 B.R. 802, 807 (Bankr. E.D. Va. 1993).

As with its companion provision, case law has elaborated upon the subsection's plain language to provide practical guidance. For instance, with respect to the first element, the statement must have been either written by the debtor, signed by the debtor, or written by someone else and then adopted and used by the debtor. *Engler v. Van Steinburg*, 744 F.2d 1060 (4th Cir. 1984). Furthermore, the statement must concern the debtor's financial condition or that of an insider. In this Circuit, the term 'financial condition' is properly given a broad scope. Its meaning reaches well beyond a 'formal' financial statement that merely lists columns of assets and liabilities in the traditional manner. *Engler,* 744 F.2d at 1060-61. Moreover, the inclusion of the defined term 'insider' brings in to play the wide net of Section 101(31).

A materially false statement is one that, "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Jordan v. Se. Nat'l Bank,* 927 F.2d 221, 224 (5th Cir. 1991) (quoting *In re Nance,* 70 B.R. 318, 321 (Bankr. N.D. Tex. 1987)); *In re O'Connor*, 149 B.R. at 807. Mere inaccuracy is not sufficient; there must be a significant understatement of liabilities or overstatement of assets in order for the falsity to be material. *In re Koep*, 334 B.R. at 373. A relevant inquiry is "whether the lender would have made the loan had he known the debtor's true situation." *In re Bogstad,* 779 F.2d 370, 375 (7th Cir. 1985).

With respect to the element of reliance, the creditor must establish not only that the statement was relied upon but that the reliance was reasonable. *In re Cohn,* 54 F.3d at 1114-17 (finding "reliance…is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar

circumstances."). When a lending institution is involved, several factors should be examined to determine reasonableness. These include, (a) the standard practices employed by the creditor to evaluate creditworthiness, (b) industry standards that define a commercially reasonable investigation of the information supplied by the borrower, and (c) whether there were any 'red flags' of inaccuracy waving at the time of the transaction that should have put a prudent lender on alert. *In re Cohn,* 54 F.3d at 1117.

Finally, the statement must be 'published', or made known, with the intent to deceive. In this context, intent to deceive means that the statement was either knowingly false or made so recklessly as to warrant a finding that the debtor acted fraudulently.  *In re Cohn,* 54 F.3d at 1118-19.  With the foregoing principles and reasoning in mind, the Court will now analyze the transactions at bar under Section 523(a)(2)(B).

**VI.**   **Analysis**

The Court's desire to do substantial justice is thrown somewhat askew by Mr. Quillen's approach. In short, his failure to file either a post or pretrial memorandum makes it difficult to identify the precise grounds of his defense. At best, the Court is left with the limited alternative of weighing his trial testimony against the balance of the facts and making a decision based mainly upon credibility.

The salient points of his testimony can be characterized as follows:

a.  Exploiting the natural 'gap' period of the land records would have been difficult to do;

b.  If he had been caught trying to exploit the 'gap' period, it would have had a devastating impact on his business; and

c.  He understood that the Foreman Group had verbally agreed to hold the Intervening IDOT until the BCSB IDOT was safely recorded.

These points do not hold up very well when contrasted against the big picture, most of which is undisputed.  However, before turning to Mr. Quillen's defenses the Court will review BCSB's case.

### a.  Did Debtor Make a Written Statement?

Although there was no evidence they were prepared by him, the Application, Letter, and Affidavit were each signed by the Debtor and confirmed that the BCSB IDOT would be in a first position against the Property.  By executing them, the Debtor adopted the terms, representations and statements included therein as his own. The Court finds that the Debtor did make multiple written statements to BCSB as a part of the transaction at issue regarding the anticipated first position of its lien.

### b.  Were the Written Statements About the Debtor, or an Insider's, Financial Condition?

Under the holding of *Engler* the statements in question could not be interpreted as regarding anything but the financial condition of an insider of the Debtor. The statements represented that BCSB would receive a first lien against the Real Property. Moreover, the Real Property was owned by an insider of the Debtor, Q-C Ridgely and the statements concerned its financial condition - the anticipated position of the BCSB lien and, by reasonable inference, Q-C Ridgely's ability to grant the same.  This necessarily raised the question of whether any other offending liens existed against the Real Property.[14]  The Court finds that the Debtor's written statements were about an insider's financial condition.

---

[14] Pursuant to Section 101(31) the term insider includes partnerships of which the individual debtor is a "general partner" and corporations of which the individual debtor is a "director, officer or person in control" and "affiliate, or insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(31)(a)(ii), (iv), (E). *Solomon v. Barman (In re Barman)*, 237 B.R. 342 (Bankr. E.D. Mich. 1999) (finding a limited liability company to be sufficiently analogous to a corporation for purposes of Section 101(31) and furthermore finding that a limited liability company is an affiliate (and thus an insider) of an individual debtor when the debtor owns, or directly or indirectly controlled, the company.)

### c.    Were the Statements Materially False?

The existence of the Intervening IDOT, in the principal balance of $300,000, was material information in the context of this transaction; substantially so. A reasonable person familiar with this industry could not conclude otherwise. It is not likely that BCSB would have agreed to grant the Loan had it known about the transaction with the Foreman Group. In an objective sense, that conclusion is compelling for many of the reasons alluded to by Mr. Wernecke. The Foreman Group Loan reduced the already marginal equity available and, moreover, inserted a lienholder into the controlling position that BCSB believed it had been promised.  Indeed, Mr. Wernecke was explicit in stating that the Loan would not have been made had BCSB known of the Intervening IDOT.[15]  BCSB should have been told of the Intervening IDOT before settlement.  To say the least, it would have been important enough to have influenced its decision to go forward.  Mr. Quillen's explicit representation that BCSB would receive a first lien – coupled with his prior grant of the Foreman Group Loan and the Intervening IDOT and failure to disclose the same– was a material misrepresentation.

### d.    Was BCSB's Reliance Upon the Statement Reasonable?

In this analysis, materiality and reliance are close cousins. *In re Cohn,* 54 F.3d at 1115.  In their own way, each inquiry has the goal of determining how important the truth would have been to the transaction. Mr. Wernecke gave uncontested testimony that BCSB relied upon each of Mr. Quillen's written representations regarding its anticipated lien position and, by inference, the existence of any other liens that might interfere with that status.  As to whether any red flags were unfurled, Mr. Quillen did not submit any such 'tip-off' evidence and BCSB did endeavor to uncover any undisclosed problems through its updated title search.  However, in this context

---

[15] Likewise, Mr. Perlow testified that the Foreman Group Loan would not have been made had they known of Mr. Quillen's stated intention to grant BCSB a first lien in a larger amount than the Mercantile Loan. This was so for the same reason – the lack of substantial equity.

BCSB's case was not without holes. There was little or no evidence given as to BCSB's standard practices in commercial real estate lending. The vast bulk of the evidence was relevant only to this transaction. Likewise, as to any relevant industry standards – there simply was no evidence submitted during Plaintiff's case regarding this factor.

Be that as it may the Court is still convinced that BCSB did (1) reasonably rely upon Mr. Quillen's representations and (2) take reasonable precautions under the circumstances to determine whether the representations he signed off on were true. As for the first point, Mr. Quillen did nothing to dispute Mr. Wernecke's testimony as to BCSB's reasonable reliance. As for the rest, it is difficult to imagine what more BCSB could have done beyond securing the title reports to attempt to peek behind Mr. Quillen's bare representations and determine whether there were any more liens. The bank did at least that much and no liens were reported. And the parties seem to agree that the reason the Intervening IDOT was not reported was because of the land records office's gap period prevailing at that time. Accordingly, BCSB's lapse in presentation should not detract from the weight of its case and the Court finds that BCSB reasonably relied upon Mr. Quillen's representations in making the Loan.

### e.    Did Mr. Quillen Publish the Statements with Intent to Deceive?

It is undisputed that Mr. Quillen signed off on several documents, all admitted into evidence without objection, that confirmed his agreement to grant BCSB a first lien position against the Real Property. There is no question that BCSB relied upon those representations in making the Loan and that the deal would not have been struck had he proposed to grant BCSB a second lien position behind the Intervening IDOT. Nevertheless, and unbeknownst to BCSB, Mr. Quillen deliberately acted in a manner contrary to his representations and BCSB's understanding by surreptitiously negotiating and entering into the Foreman Group Loan.

Mr. Quillen claims he understood that the Intervening IDOT would be held from recordation until after the BCSB Loan was closed. However, Mr. Perlow specifically denied that such a thing had ever been discussed let alone agreed to. In this industry, it would be risky in the extreme for a lender to hold its deed of trust from recordation following settlement. All manner of bad outcomes could result from that sort of practice and it is only reasonable to conclude that if that type of aberrant behavior was agreed to, then sophisticated parties (such as these) would have a very good reason for doing it and would memorialize their intentions in writing. That did not happen here.

As between the two witnesses - Mr. Perlow and Mr. Quillen - it was Mr. Quillen who had every reason to give dishonest testimony. Mr. Perlow had none. Indeed, Mr. Quillen stated at trial that there are some circumstances where falsehoods are acceptable and justified such as the one that ultimately led to his disbarment. It would logically follow that the possibility that a substantial debt might be declared non-dischargeable may well present one such additional circumstances where moral compromise is appealing to the Debtor.

If there was no agreement to withhold the Intervening IDOT from recordation – and the Court expressly finds there was none – then it must be concluded that Mr. Quillen intended the natural consequences of his actions: the recordation of the Intervening IDOT on a date prior to the BCSB settlement. In this case, the natural consequence of that was that the Intervening IDOT fell into a first priority position against the Property. A man with as much experience in the industry as Mr. Quillen cannot claim ignorance of that reality.

Likewise, if Mr. Quillen was proceeding in good faith, and regardless of any 'agreement' with the Foreman Group, why did he not simply tell BCSB that he had entered into the Foreman Group Loan which used their putative collateral as security. There is no dispute that BCSB had no

knowledge of the 'gap' transaction. If Mr. Quillen wanted BCSB to be protected from the effect of the Intervening IDOT, then all he had to do was tell the bank about it in advance of settlement. But instead he chose to remain silent.  And the Court believes he remained silent with full knowledge of the existing gap period and the likely consequences of his actions.

The Court does not believe that Mr. Quillen was deterred by the risk of discovery either due to his business interests or the timing of the two transactions.  In short, the Court concludes that to the extent he took any of that into account, it was ignored in favor of the chance to pocket approximately $500,000 through both settlements; something that would not have occurred if either lender knew of the other's existence. Thus, the Court concludes, and finds, that Mr. Quillen intentionally used the false written statements to damage BCSB such that the resulting deficiency should be excepted from his discharge.

**VI.**     **Conclusion**

In conclusion, the Court finds that all of the elements of Section 523(a)(2)(B) have been satisfied and that the underlying debt should be excepted from the Debtor's discharge.  A separate order memorializing this ruling shall issue.

END OF OPINION